Submitted November 15, 2011, reversed and remanded July 11, 2012

**STATE OF OREGON,**
*Plaintiff-Respondent,*

*v.*

**NICHOLAS BRYAN MORGAN,**
*Defendant-Appellant.*

Jackson County Circuit Court
091770MI; A143475

284 P3d 496

Peter Gartlan, Chief Defender, and Daniel C. Bennett, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and Justice J. Rillera, Assistant Attorney General, filed the brief for respondent.

Before Sercombe, Presiding Judge, and Brewer, Judge, and Egan, Judge pro tempore.

BREWER, J.

## BREWER, J.

Defendant, who was convicted of DUII, argues that the trial court erred when it refused to allow defense counsel, pursuant to OEC 706, to impeach on cross-examination two police officers based on provisions of the National Highway Traffic Safety Administration's Field Sobriety Test Instructor's Manual (the NHTSA manual). In additional assignments of error, defendant challenges several other rulings in which the trial court excluded evidence pertaining to his medical condition, the effects of certain medication on that condition, and the reliability of field sobriety tests. Because we agree that the trial court erred in precluding defendant from cross-examining the police officers with respect to certain provisions of the NHTSA manual, and the error was not harmless, we reverse and remand.[1]

To provide context for our analysis of the challenged evidentiary rulings, we set out the evidence at trial that was consistent with defendant's theory of defense. Defendant, who was 25 years old at the time of his arrest, had been treated for attention deficit hyperactivity disorder (ADHD) and social anxiety disorder since 2004. Defendant took a drug called Concerta to treat his ADHD. Concerta is a time-release version of methylphenidate, commonly known by its brand-name, Ritalin. A proper dose of Concerta, which is a stimulant, can cause a person with ADHD to improve his or her ability to focus and to think more clearly without being easily distracted, whereas an incorrect dose can increase heart rate and blood pressure, lead to more risk-taking behavior, and cause a more rapid flight of ideas. Methylphenidate is a Schedule II controlled substance.

Late at night, Officer May saw defendant's vehicle drifting within its traffic lane, touching the fog line, and traveling 68 miles per hour in a 55 mile per hour zone. Upon stopping defendant, May noticed that defendant was

---

[1] We do not address in detail defendant's remaining assignments of error, even though similar evidentiary issues could arise on remand; as the state points out, defendant may have failed to make an adequate offer of proof or otherwise lay a proper foundation to preserve those evidentiary challenges. Because a different record could be created on a retrial of this case, we perceive no benefit to the bench, the bar, or the parties to be derived from analyzing in detail the ways in which the current record may be insufficient to reach those challenges on the merits.

moving slowly, had red, glassy eyes, and emitted a faint odor of alcohol. In response to May's request, defendant promptly handed over his insurance information, but held on to his license and registration for several extra seconds. May asked defendant for those documents again, and defendant provided them. Suspecting that defendant was under the influence of alcohol, May asked defendant if he would consent to attempt to perform the field sobriety tests (FSTs). Defendant said, "Yes." Defendant performed poorly on the tests, and May arrested him for DUII.

At the police station, May read an implied consent form to defendant, and defendant agreed to take an Intoxilyzer breath test. The breath test indicated that defendant had a blood-alcohol level of .00. Suspicious that defendant was under the influence of some other substance, May contacted Trooper Lee, an Oregon State Police Drug Recognition Expert (DRE). Lee arrived at the station and performed a DRE evaluation on defendant. As part of the evaluation, Lee interviewed defendant, who acknowledged taking Concerta, as well as Paxil. Defendant was cooperative and polite, but responded slowly to Lee's inquiries. After conducting the DRE examination and learning that defendant had ingested Concerta, Lee concluded that defendant was under the influence of a stimulant. A later urinalysis confirmed the presence of methylphenidate in defendant's system.

Defendant testified at trial. He acknowledged that he took Concerta to treat his ADHD. However, defendant testified that he was a better driver with his medication than he was without it. Specifically, defendant said that he had better attention to detail when he was on his medication. Defendant testified that he took only the prescribed amount of his medication. Defendant also explained his poor performance on the FSTs; he was extremely upset at being suspected of a crime and, as a consequence, he was trembling and had trouble with balance while performing the FSTs. Defendant's father also testified that defendant had been helped by his medication. Although defendant still struggled with some issues, such as anxiety, his overall condition had been improved by his medication. Defendant's roommate, Emmons, testified that defendant had always had balance

problems—that, in fact, defendant was extremely clumsy—and that defendant was very distressed the morning after his arrest.

During his cross-examination of Officer May, defense counsel elicited May's acknowledgement that FSTs such as the horizontal gaze nystagmus test are used to estimate blood-alcohol content, as opposed to testing a person's mental or physical faculties. Defense counsel next asked May if he recognized the NHTSA manual as the authoritative manual that officers use in analyzing, interpreting, and conducting FSTs. May answered: "Yes, Sir." The following exchange then occurred:

"[DEFENSE COUNSEL]: Okay, let me read you something here. And as you can tell it's from the book, right?

"[THE WITNESS]: Yes, sir.

"[DEFENSE COUNSEL]: Many individuals including some Judges believe the purpose of field sobriety tests is to measure driving impairment. For this reason they tend to expect tests to possess 'face validity' that is tests that appear to be related to * * *

"[PROSECUTOR]: Objection, Your Honor.

"[THE COURT]: Sustained.

"[DEFENSE COUNSEL]: I'm going to ask if he agrees with this statement.

"[THE COURT]: No, it's sustained. It's hearsay."

Defense counsel made an offer of proof by reading from the NHTSA Manual. The point of the offer was to describe "what field sobriety tests are and aren't, because the statement has been made that field sobriety tests have some correlation of some particular value and ability to drive a car and, frankly, I am going to read what this scientist actually said about that issue." Defense counsel then read several excerpts from the NHTSA manual that cautioned that the approved battery of FSTs are intended to measure blood-alcohol content, not driving impairment. The prosecutor then reiterated her objection:

"And, Your Honor, we would still object, because allowing him to read two pages into evidence is allowing him to

testify. I think the proper way, if he would like to impeach him, would be information contained in the booklet is to allow the officer to read the booklet to himself to analyze that paragraph and then he can adopt it or not. If you are allowed to read two pages into evidence you are testifying."

Defense counsel replied, "If you are impeaching (Inaudible) you make a statement. (Inaudible) you ask the individual if they agree or disagree with the statement. That is how it is done." The trial court expressed uncertainty about whether the officer was familiar with the particular treatise:

"Well I do not know who these people are and, quite frankly, I do not even know if this officer has been trained on that particular manual. If this officer has not been trained on that particular manual this officer would not have information to that * * *."

Defense counsel explained that it was his intention to read one sentence at a time, and he asked the officer, "Do you disagree with that statement or disagree with my last statement[.]" The trial court ruled, "I am not going to allow it."

During the cross-examination of Lee, defense counsel sought to engage in a similar form of impeachment—that is, to question Lee about whether he agreed or disagreed with certain statements in the NHTSA manual. In response, the prosecutor objected, "Your Honor I would object. [Lee] stated that he is not in fact familiar with this document." The trial court sustained the prosecutor's objection, agreeing that, "[b]ased on that I do not believe that he has any familiarity of that document[.]" Defense counsel continued to try to question Lee regarding the contents of the NHTSA manual, and the prosecutor again objected. The court sustained the objection, suggesting that the prosecutor frame her objection in terms of relevance and then sustaining it on that basis:

"[THE COURT]: If you are reading directly from the document to the paper then it is almost as if you are asking a question from the document. If Mr. - if the Trooper does not have an opinion. If he has not read that document. Are you objecting as to relevance then counsel?

"[PROSECUTOR]: Yes, Your Honor.

"[THE COURT]: It is sustained on relevance."

Defendant asserts on appeal that the trial court erred in excluding the challenged evidence because it was admissible under OEC 706, which provides:

"Upon cross-examination, an expert witness may be questioned concerning statements contained in a published treatise, periodical or pamphlet on a subject of history, medicine or other science or art if the treatise, periodical or pamphlet is established as a reliable authority. A treatise, periodical or pamphlet may be established as a reliable authority by the testimony or admission of the witness, by other expert testimony or by judicial notice. Statements contained in a treatise, periodical or pamphlet established as a reliable authority may be used for purposes of impeachment but may not be introduced as substantive evidence."

The state responds that defendant's offer of proof was insufficient and that any error was harmless because the evidence of defendant's guilt was overwhelming.

To assure that appellate courts are able to determine whether a trial court erred in excluding evidence and whether that error was likely to have affected the trial's result, an offer of proof ordinarily is required to preserve error when a trial court excludes testimony. *See State v. Affeld*, 307 Or 125, 128, 764 P2d 220 (1988) (overruling line of cases holding that offer of proof was not required on cross-examination). In *Affeld*, the court stated:

"Article VII (Amended), section 3, of the Oregon Constitution requires this court to affirm judgments of lower courts if, in the opinion of this court, the judgment achieved the correct result, even if error was committed. That constitutional provision makes it incumbent on lower courts and the parties appearing in lower courts to ensure that the record reviewed by this court is adequate for this court to make a reasoned decision. A record can be adequate in situations in which the scope of testimony is restricted by the trial court only if an offer of proof is made."

307 Or at 128-29.

We review the state's assertion that defendant's offer of proof was insufficient to preserve an issue advanced on appeal by considering whether the purposes that underlie

the requirement were fulfilled by defendant's offer. *See State v. Stevens*, 328 Or 116, 122, 970 P2d 215 (1998) ("[I]n considering whether an objection at trial raised the 'issue' being advanced on appeal, an appellate court must view the facts in light of the purposes of fairness and efficiency that underlie the requirement."). The purpose of the rule requiring an offer of proof to preserve a claim of error when a trial court excludes testimony is "to assure that appellate courts are able to determine whether it was error to exclude the evidence and whether any error was likely to have affected the result of the case." *Affeld*, 307 Or at 128; *see also* OEC 103(1) (stating that an error is preserved if the substance of the evidence "was apparent from the context within which questions were asked"). "One method of making an offer of proof is by question and answer. It also is acceptable, however, for a party's counsel to state what the proposed evidence is expected to be." *State v. Phillips*, 314 Or 460, 466, 840 P2d 666 (1992).

In *Schacher v. Dunne*, 109 Or App 607, 820 P2d 865 (1991), *rev den*, 313 Or 74 (1992), the plaintiff was injured when her pickup truck collided with a car driven by the defendant. She sought damages for personal injuries and medical expenses. The case was tried to a jury, which returned a verdict in favor of the defendant. The plaintiff moved to set aside the judgment and for a new trial on the ground that the trial court had erred by denying her the opportunity to cross-examine the defendant's expert witness, a medical doctor, about whether the plaintiff's symptoms could be explained by psychological factors. The trial court granted a new trial. The defendant appealed, asserting, among other arguments that, even if denying the opportunity to cross-examine was error, the error was not preserved because the plaintiff had made no offer of proof. We disagreed:

> "[W]hen an error that affects a substantial right of a party is based on a ruling that excludes evidence, it is preserved if 'the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.' OEC 103(1)(b). *** One purpose of an offer of proof is to 'assure that the trial court can make an informed decision. An offer of proof permits

the parties to raise additional arguments, if appropriate, and gives the court an opportunity to reconsider its ruling and correct any error.' *State v. Olmstead,* 310 [Or 455, 461 n 1, 800 P2d 277 (1990)]. That purpose was satisfied here. The questions asked and the arguments presented to the court on the issue were adequate to inform the trial court of the substance of the evidence and its error in excluding it. The court's ruling that the witness was unqualified to render an opinion about psychological issues shows that the court understood the substance of what plaintiff was seeking to show by that line of cross-examination—that the witness had no expertise and that, therefore, his testimony had little weight. We conclude that the error was preserved."

*Id.* at 610-11 (emphasis omitted). In so concluding, we distinguished *Affeld:*

"[*Affeld*] overruled the line of cases that had held that an offer of proof need not be made on cross-examination. It did not, and could not, overrule OEC 103(1)(b). Although it states that an offer of proof is always required, unless the trial court refuses to allow the offer of proof to be made, that statement must be considered in the light of the facts of that case. In *Affeld,* the defendant not only made no offer of proof, he asked no further questions and made no arguments regarding the court's error in excluding the evidence. 307 Or at 127. The court, therefore, did not consider the language of OEC 103(1)(b) that states that an error is preserved if the substance of the evidence 'was apparent from the context within which questions were asked.' [*Olmstead,* 310 Or at 459], cites *Affeld* for the proposition that, '[i]n order to preserve error relating to the exclusion of evidence, a party ordinarily must make an offer of proof as to the content of the excluded evidence.' That statement suggests that the court may not consider *Affeld* to be as restrictive as its language indicates."

*Schacher,* 109 Or App at 610 n 1 (emphasis omitted; brackets in original).

In this case, based on certain excerpts from the NHTSA manual, defense counsel represented to the trial court what his questions to May and Lee would be, and he advised the court that he intended to impeach the officers with those excerpts. Implicit in that offer of proof was defense counsel's expectation that the officers would be

required to concede (and one of them did) that the NHTSA manual was authoritative. It was also apparent from the preceding questions on cross-examination, the quoted passages themselves, and the colloquy between the court and counsel that defense counsel intended to use the quoted passages to challenge the reliability and accuracy of FST results to measure driving impairment in a DUII prosecution involving a controlled substance such as Ritalin. Thus, here, like in *Schacher*, the purpose of defense counsel's offer of proof was evident from its context, and it was sufficient to preserve defendant's challenge on appeal.

We turn to the merits of defendant's challenge. At various intervals, the trial court sustained objections to the use of the NHTSA manual on three different grounds. Initially, the court ruled that the evidence was inadmissible hearsay. It was not; rather, defendant intended to use the evidence for impeachment, not substantive purposes, in precisely the manner that OEC 706 contemplates. *See* OEC 801(3) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.").

Later, during both the cross-examination of May and Lee, the trial court ruled that the evidence was inadmissible on foundational grounds, because the court did not know "who these people are," and Lee professed that he was not familiar with the NHTSA manual. That ruling also was mistaken. OEC 706 does not require that the witness being cross-examined be personally familiar with a learned treatise if its reliability is established in another authorized way. Instead, the rule provides that "[a] treatise, periodical or pamphlet may be established as a reliable authority by the testimony or admission of the witness, by other expert testimony or by judicial notice." As Professor Kirkpatrick has observed:

> "[OEC 706] allows a party seeking to impeach an expert with a learned treatise to more easily establish that the treatise is a 'reliable authority.' Rather than being dependent on the testifying expert to acknowledge that the treatise is a reliable authority, the cross examiner can establish its authoritativeness by other means * * *."

Laird C. Kirkpatrick, *Oregon Evidence* § 706.03, 643-44 (5th ed 2007). Here, May acknowledged that the NHTSA manual was the authoritative reference source that police officers use in analyzing, interpreting, and conducting FSTs. That testimony provided a sufficient foundation for its use in the cross-examination of both expert witnesses, irrespective of Lee's professed unfamiliarity with it.

Finally, and perhaps most perplexing, was the trial court's ruling that the evidence was not relevant. Defendant's theory of the case was that the police, mistakenly believing that he was under the influence of alcohol, administered FSTs that are principally designed to confirm a suspect's blood-alcohol content, and which do not reliably assess the driving impairment of a subject who has ingested a prescribed dose of medication that is intended to improve his or her ability to focus on a task at hand. Thus, the line of questioning that the court excluded went directly to the heart of defendant's theory, and the trial court erred in concluding that it was not relevant.

Even so, evidentiary error is not presumed to be prejudicial. OEC 103(1). Thus, we must affirm defendant's convictions if there was "little likelihood" that the evidence would have affected the jury's verdict—that is, the error was harmless. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). In *Davis*, the Supreme Court explained that a variety of considerations may properly inform that "single inquiry," including "the nature of the error that occurred below," and the "context of the legal error." *Id.* The court noted, for example, that the erroneous exclusion or admission of evidence would be harmless "if the particular issue to which the error pertains has no relationship to the jury's determination of its verdict," *id.* at 32, or if the jury "would have regarded the * * * evidence as duplicative or unhelpful to its deliberations." *Id.* at 33. Ultimately, the court in *Davis* concluded that the erroneous exclusion was not harmless, because it could not "say that the excluded statements were merely cumulative of [admitted] evidence"—and, indeed, "were qualitatively different than the evidence that the jury heard"—and because "the excluded evidence goes directly to the heart of defendant's factual theory of the case." *Id.* at 34.

Similarly, the error was not harmless in this case. As noted, the excluded impeachment evidence went directly to the heart of defendant's trial theory; it challenged the reliability—under the circumstances of this case—of the FSTs upon which convictions in DUII cases so frequently hinge. The state makes much of what it regards as strong evidence of defendant's guilt. However, the excluded evidence was qualitatively different from any other evidence that was admitted at trial, and, although the jury was free to credit it or not, it hardly could be said that it would have been unhelpful to the jury's determination of its verdict. In fact, the tack that defense counsel sought to take probably represented the fruition of defendant's best chance of avoiding a conviction. We cannot say that there is little likelihood that the evidence would have affected the jury's verdict.

Reversed and remanded.